with case number 242947, Gluck v. Hecla Mining Company. Mr. Zakharoff, whenever you're ready. Thank you, Your Honor. Samuel Zakharoff for the Gluck Appellants. May it please the Court. This is a case that involves the interpretation of statutory safe harbor for forward-looking statements under 15 U.S.C. Section 78U-5C. The first element of the statutory test has itself two components. The statement must be clearly forward-looking and must be, and I quote, identified as a forward-looking statement. The second part in the conjunctive, and it must be accompanied, and here's the statutory language, by meaningful cautionary statements identifying important factors that could cause actual results to differ materially. Our submission, Your Honors, is that the court below erred on both of them. With regard to the first prong of the specific forward-looking statements, there were representations made by the company, and they're detailed in the briefs, on positive cash flow, extended mine life, water management, a specific figure of 162,000 ounces of production, self-funded projected growth, and other such concrete steps. Under the well-established canon and interpretation of lex specialis and under the law of this circuit, general cautionary notes cannot overcome specific representations if they are false at the time that they are made. This is what the court held in Slayton and Iowa Public Employees, and most notably in the lead case from this circuit to this day, the Vivendi case, this court found that a company that represented, quote, it entered 2001 with a very strong balance sheet, that that was sufficient to take the company outside the bounds of forward-looking statements, even though there were accompanying statements that said, of course, things may differ and things may not go as we have expected. Keep going. I have no quarrel with anything you've said so far, but, of course, the devil is in the details here, and we've got line-drawing problems, and the example you just gave strikes me as an easy one. That is, if you say our balance sheet is strong, that is clearly a statement of present fact. But one of the ambiguities I find in a lot of the statements here is that they could be construed as forward-looking or they could be construed as present. For example, the life of mine is explicitly a statement about how long this vein can be expected to last, which looks forward-looking. On the other hand, you could say this is a term of art and it is a fact. It is a present fact what the current projections of life of mine are. So that's just one example of line-drawing. Then when you get to the cautionary tales, right, if it was just, hey, stuff happens, life changes, it's hard to tell what the future is, that's not good enough. But what if you have, in the mining industry, in effect, stuff happens, veins can run out, there can be unexpected events in connection with A, B, and C, which may not exactly capture the specific things that you highlight, but are more specific than just stuff happens, there are unknown unknowns. So, you know, maybe it would help if you could give me your best two examples of why you have either a clearly not forward-looking statement or you have something that maybe it's a forward-looking statement but the cautionary language either doesn't exist or falls short. Judge Lynch, let me take the first part, but I really want to focus on the cautionary language side, if I may. But the first part, 162,000 is an exact number, and that has to be based on something. And our representation of the facts alleged here, and note, these are facts alleged, so we're on a motion to dismiss, so if there has to be a weighing of the facts, we think that that's not proper on a motion to dismiss, and this is the first time we've argued before any court in six years, and so we've never had a chance to represent, to make the factual presentations. 162,000 is a specific number. We have specific information from the confidential informants that at the time that was said, the real internal figure was 80,000. Right, because 162,000 is last year's number. That's a fact, and probably an accurate fact, at least you don't say it was wrong. The way I understand it, Judge Lynch, the way it's presented in the complaint, is that today we are mining at the rate of 162,000 ounces per year. That's a representation of present facts. Right, but they were told that it's running out and it's looking more like it will be 80,000 this year. Two separate issues. One is it's 80,000 this year, and then through the class period that number goes down, but it's never corrected in any representation, number one. Number two, there's also the question of what's called life of mine, which is how long is this mine going to be useful for us? They represent it's five years. Internally, they were saying it was three years, and then by the end of the class period, that's a year and a half. So those are all factual representations. Yes, they are covered or colored by future assessments, but you cannot, the language of Vivendi is that you cannot obscure the present state of the case, and there are many cases from this circuit that say the same thing. But if I may, I'd like to turn to the cautionary language, because this is a requirement under the statute, and it's meaningful. The only place I could find a cautionary language that was specific to the gold mining acquisition through the Klondex mines is on JA41, where the company says that as a result of the acquisition, there will be increased sensitivity to gold price fluctuations. That says nothing about what's going on in the mines. It just says we bought a gold mine, so now we're more sensitive to gold prices on the market. But if you look at what the district court found to be meaningful cautionary statements, these are all generic statements. For example, JA55, which is quoted by the district court at SPA16, the properties we acquire in any acquisition, so right there by the terms, it's not about the Klondex acquisition, including our recently acquired Nevada operations, may not produce as expected, may be in an unexpected condition, may be subject to increased costs and liabilities, including environmental liabilities. At JA298 from the May 2018 10Q, we have the same. We may not realize all of the anticipated benefits from the acquisition of Klondex, any consummated or any future acquisitions. The appellee's brief at page 4 quotes from this exact same language, but doesn't quote the header that's put there, which is the Klondex properties and any others we may acquire may not produce as expected and may not generate additional reserves. And you're also arguing that at the time at least some of these cautionary statements were made, there already was information that things were already not working out as planned. That's exactly right. And as this court said in Vivendi, there was a difference between the external dialogue and the internal dialogue. And we have the confidential informants who are telling the responsible officers of the company that this is not the way, that we can't handle the water, the cash flow is negative. And then when we have Mr. Baker, the CEO, at the end of the class appearance, saying we were cash flow negative from the beginning with these mines. And the representation to the market was that Klondex may have had problems, but that once it was acquired by HECLA, HECLA had special knowledge in what they called small vein mining, close port mining, that could successfully exploit these gold reserves. I'd like to just quote the language that HECLA uses. A number of risks and uncertainties that could cause actual results to differ materially from those projected, expected, or implied. In Vivendi, the language that this court found insufficient was that it could cause actual results to differ materially from those described in the forward-looking statements. It's identical language, and in Vivendi, this court said, this is a kitchen sink disclaimer listing garden-variety business concerns that could affect any company's financial well-being. This is not meaningful cautionary language. And the big difference, the only difference between this case and Vivendi, I would submit, is that Vivendi was after a trial, and it was finding that these kinds of representations were sufficient for a jury to conclude that there was a disparity between the internal dialogue and the external dialogue. Here, we didn't get to a jury. We didn't have discovery. We haven't taken a bit of anything in this case, and so the language that was sufficient to uphold the jury verdict here is not even sufficient to survive a motion to the court. If I may, it's just one further more technical question. What is before us with respect, if anything, with respect to the scienter issue? The district court, as I read it, has just one paragraph in the operative opinion that is strange. It says, we don't need to reach that, we're not going to reach that, and then the very next sentence says, and besides that, there are no adequate allegations of scienter. Is that before us, or is that something that if we agree with you about everything you've said, about the bottom line of what you've been saying so far, we just send it back and the district court then has a crack at analyzing scienter issues? Yes, Your Honor. We think that under this court's opinion in Novak v. Cassex, which is 216 F. 3rd, 300, that the fact that they had access to the information that we've alleged, if you find that information to be sufficient, is sufficient to establish the scienter of the deception here. The district court, as you said, Your Honor. Sorry, could you repeat that last statement, the fact that they had access to the information? Yes, that's what this court said in Novak. So you don't have to find who had actual knowledge of each piece of it. The fact that the company had knowledge of the fact of 162 is not 162, positive cash flow is negative cash flow, water management is not successful, et cetera, et cetera, that that's sufficient. So what's your theory there that access was from the confidential informants that Baker and the others should have been aware of it? Well, we know that McDonald's, for example, is designated under Canadian law as the lead person, which means under Canadian law he's like a 36 witness, and we have the confidential informants telling McDonald's, saying that they told McDonald's alleged complaint, that we don't have water management here, we don't have the kind of production that we represented, et cetera. So that's under, I would submit under Novak, that's sufficient. But McDonald's didn't believe that. Excuse me? But don't you also have to allege that McDonald's actually believed that? Yes. So the fact that he was aware. It has to be plausibly alleged. That's right. We have to have enough in there to make the – But I wasn't asking you so much about the merits of the thing as is this really properly before us at this time? So we think not, Your Honor. We think that in the first instance this is a court of review and that there wasn't – certainly if we were reviewing the scienter standard alone on appeal, I think this court would find that it was insufficiently reasoned and determined to sustain. So this should go back. Our friends here believe that it has to be resolved here. Yes, Your Honor. Yeah, so let me just ask because there's a question on whether to go back and then if we get to the merits you've started – you've opened the door a little bit in terms of appropriately in response to the question. On the scienter, when asked to sort of pick your strongest statement, you talked about the $162,000. So that came from Baker, and I don't see the allegation that sort of supports falsity in scienter is the allegation that HECWA executives, including Bradford, were informed that due to or characteristics, gold production would drop to the mid-'80s. And we have Baker, the statement that is the basis of the complaint, saying he's relying on Klondike's most recent estimate, which was actually somewhat higher than the $162,000. So how do you get to falsity in scienter? How do you get to Baker – you know, plausibly alleging that Baker knew when he said that that it was false if you get that – would get to that stage? Well, Baker says it the first time in a press release at the very beginning of the interactions with HECWA. Baker repeats it in a press release on July 23rd. At the time of the closing. At the time of the closing. Okay, but that's three months into the class period. So in terms of what we're calling statement number one, do you have something at that juncture? I think the court called it statement number one. Yes. What happens at statement number one, there's a finding – there's a statement by Baker at the close of the class period in which he says these mines were cash flow negative from the very beginning. And there was a representation made in the first instance that these were cash flow positive. We were going to be able to fund all the operations and the expansion of production from the cash flow positive. We also have the statement from Baker at the end of the class period in which he acknowledges that there was a need to close this transaction in order to get the credit facilities more cheaply for HECWA overall. So it's – I understand that there's a very complicated case law and the role that the motive plays in this. But we say why they were doing it, and we identify the misrepresentations, and we identify when the misrepresentations – Right. I'm just trying to – I mean, your arguments are compelling at the 30,000-foot level, but at some point we have to take each of them and match them to a statement and go through each of the steps. And there's a question about how far we get into that versus sending it back. And so I'm literally just saying, okay, statement number one, you've made an argument as to why that's not actually forward-looking and why there's inadequate cautionary language. So then I'm saying to myself, okay, on that statement, where's the allegation that plausibly alleges falsity and knowledge of falsity essentially? And it sounds like you've given me what you have. It just didn't seem like it squarely addressed it. Well, Your Honor, the best that we did, I think, is the table that's at the back of our reply brief. And we try to match each statement to not only why it was knowingly – I'm sorry, why it was false when said, but we match it as best we can to the state of mind, the scienter, at that moment. I can't do better than the citations on that table. Yeah, I mean, falsity seems easier, right, because you do have a – in terms of what objectively is true, you have the confidential informants, and just to be clear, they're confidential in the sense that they're telling you this in confidence, but they were actual significant figures in the management of the minds under prior ownership who were not as confidential informants but as people who were responsible for responding to due diligence questions. That's exactly right. Who said certain things to heckle at the time. Then we get to the separate question of knowledge of falsity, which I guess as far as motive is concerned, one thing that has troubled me about the early stages of this is if they really believed that these were crummy minds, why were they buying this? On the other hand, I think we have an evolving situation. What do you have to – how much do you have to win to get at least some of your case passed the motion to dismiss? What if statements four through eight, for example, turn out to be rather strong and maybe statement one and two less so or more likely to be construed as puffery or something like that? What is the outcome if one were to reach a conclusion like that? I think, Judge Lynch, the outcome would be that it should be sent back and that it should survive – this complaint should survive a motion to dismiss, and then when we get to the question of class certification, the class should be certified for the period in which there is at least prima facie compelling evidence. So if it's only statements four through eight, the class period could be shrunk. It could be shortened, but that would be something to be decided at future. For now, the issue before us is simply, in your view, that for each statement we need to assess is it properly construed as forward-looking or potentially as puffery, and if it is construed as forward-looking, is there adequate cautionary language? Exactly, Your Honor, because that's the grounds on which we were thrown out. Right. So we could have a checklist saying, you know, one, three, five, nine, survive, two, four, six, eight. Probably not, but now it goes back to the district court to worry about class certification. And it also would permit us to take discovery on this issue, and right now all we have is the allegations. And standard, as the court well knows, is is it sufficient to be plausible under the facts alleged? If we followed the procedure you're describing, it wouldn't go straight to discovery, right? The district court would then, for those statements that survive the forward-looking cautionary language analysis, and that's all you think we should do, the district court would then have to look for plausible allegations of knowledge of falsity. That's correct, Your Honor. That's correct. So it's very possible that we end up right back here again reviewing if the district court, if the district court's not satisfied on those metrics, we're back up here again looking at the same allegations and now moving to the next step of the checklist. We hope not, Your Honor, but yes, that's a possibility that the district court could decide on the Sienta issue, that there's insufficient allegations of Sienta, at least through some portions of this, dismiss us on that basis, and then, of course, depending on how the order was severed and so forth. Of course, if even one allegation survives this appeal and the Sienta analysis, then there's not a final order. That's correct. So we wouldn't be back here. That's why I said depending on how it was severed for purposes of the entry of a final order. Thank you, Counselee, but you've reserved two minutes for revoke. Thank you very much, Your Honor. Mr. Hicks. Thank you, Your Honor, and may it please the court, George Hicks for the appellees. The district court initially dismissed Plaintiff's first amended complaint on numerous grounds, including, first, that any alleged misstatements by Heckler executives were forward-looking and protected by the PSLRA's safe harbor. Second, the alleged misstatements were not false or misleading. And third, Plaintiff's failed to adequately allege a strong inference of Sienta. The district court doubted that amendment could cure these many defects but allowed Plaintiff's to replead. Plaintiff's second amended complaint did not cure these deficiencies. Plaintiff's added approximately eight new alleged misstatements, provided a handful of new allegations regarding Heckler's supposed knowledge. Right, but let's get to what they are. We're dealing with that amended complaint now, right? Yes. So the question before us is specific to that complaint, right? Yes, Your Honor. And so when you take a look at the allegations in the complaint that were actually alleged, it fails for three independent reasons. Number one, these statements all concern projections, plans, objections, aspirations, or assumptions. Well, okay. Yeah, all right. Let's talk about specific ones. Let's talk about statement number four, as the district court called it. At the closing, Mr. Baker says this immediately adds cash flow, immediately adds production. That's talking about what's happening today, isn't it? Well, Your Honor, I think that that is talking about what's going to be happening in the future. It immediately adds production and cash flow. But I would also add that if you construe that as a present statement, there's no falsity or misleading aspect to it. It was adding production and cash flow. The district court, first of all, said in the first opinion that that is not a forward-looking statement. And then in the second opinion, it says it is a forward-looking statement without any explanation for why the court changed its mind on that. Is that not a fair statement of the comparison of those two opinions? I think the district court reached a different conclusion on the second amended complaint. Okay. Then isn't it the case that the second amended complaint, the complaint before us, says that a confidential informant says that he, she, or it told Radford and the board during due diligence that production was declining from 162,000 ounces to about 80,000 ounces? Well, Your Honor, I actually want to go to the actual allegation because I think it's important in the second amended complaint that they always go to about that particular allegation. Well, that's what I'm asking you to do. Yes, and I will do it. It's second amended complaint, paragraph 13A8. This is at JA913. What they say is Hegel executives, including Radford, were informed that due to the ore characteristics at Fire Creek, gold production would drop to mid-80,000 ounces in 2018. And again, later at paragraph 11. That's a quarter of the way through 2018 that that statement is being made. But I still think it's a projection about what production is going to be in 2018. I don't think you can construe it. On what basis can you say that production is going to match last year's 162,000 ounces when you've been told that the best estimate of the people who know the most, who are telling you this in your due diligence, is that this year it's going to be half of that? How is that a true statement when you say things like, hey, we're adding 162,000 ounces of gold to our production now with this acquisition? Well, because number one, based on the past year's production, that is consistent with what it was. Number two, that is exactly what Klondex had projected as well. Number three, to go to a point that Judge Robinson made, Mr. Baker, the CEO, had never been told about any of this. I mean, that's the base accusation here. So there's no scienter at all as well. I mean, there's multiple problems with each of the statements here. And I think you do have to go through each of them to talk about whether they were false. Did the district court say there was no scienter on the part of Baker in making this statement? The only thing in the opinion before us for review about scienter is a one-sentence, they don't adequately allege scienter, conclusory global statement immediately following a sentence that says we're not reaching the scienter issue here. We don't need to reach that. Your Honor, a few responses to that. Number one, of course, even if the district court hadn't said anything, you have the discretion to review it because it's in the record. Number two, I think the reason the district court said, first of all, I need not, but I'm going to find that there is not sufficient facts alleging scienter, is because it had already issued the first ruling, and it did address scienter in that. But the allegation that we're talking about was not in that first complaint, was it? If you're talking about – The allegation about what was said to Radford by confidential informant 13 or 14, whichever one it was, is that in that original complaint? I think that's a new one, but the overall – But that's the whole point. If we've got a new complaint that makes this allegation, and you are telling us reasonably it's got to do with what Baker specifically knew with respect to this allegation, that it's insufficient, okay, that's an argument. But you can't then tell us that the district court totally analyzed this already in the first opinion. We should rely on that. I'm not saying that he totally analyzed it in the first opinion. What I'm saying is the parties – half of the party's briefing below on the second motion to dismiss was devoted to scienter, half of the briefing. So this was before the district court. Half of the briefing, but of the district court's opinion, one paragraph in a whatever it was, 20-something page opinion, right? Yes, but this court is not constrained by the ability to review that simply because there was one sentence. We are a court of review, not a court of first instance. You're asking us to analyze this. How much of the briefing here is devoted to scienter, for example? Well, we devote a considerable amount. Right, in the usual way of saying, hey, even if the district court was wrong in what it did, we've got this alternative ground of affirmance. And then they get to have something in the reply brief to address that. But that's not the way we usually do business. Well, Your Honor, I do think that you have affirmed on alternative grounds before. We have. Certainly we have. And I think that this is actually a different case. Listen, I've been here now for like, what, a dozen years or more. And I can tell you in proportion to the number of times that FLEs say, oh, you can affirm on other grounds, the ones in which we actually take up that invitation tend to be ones where that alternative ground is so clear and the one that the district court acted on is so muddy and difficult to figure out that it's a very easy call to do the alternative ground. They are a very small minority of the cases. The normal practice is to send it back and let the district court take it. If we send it back and the district court comes to a conclusion, what deference do we give this district court's reasoning on review? If it's a conclusion on scienter, Your Honor? On anything. I believe it's de novo. On a motion to dismiss. It's de novo review. Okay. On a motion to dismiss, which is, I think, another reason why this court need not feel constrained to look at the allegations in the complaint and reach its own determination that there's no scienter here. So let me ask a different question while I have you. It just popped out of my mind as soon as I said let me ask you a different question. I'll come back to it. Keep going. Sure. Well, Judge Robin, you actually had said earlier that there's a very good chance we could just be back here in a year on the scienter issue, and I think that exactly would be the case because the district court has already said that it does not find that there's sufficient scienter. Here's my other question, and sorry about that. I spaced out for a second, but there's a distinction in the life of mine allegation. Much of your response emphasizes the distinction between reserves and resources. Can you explain to me, I'm just not as familiar with mining jargon, what resources are and how that distinction matters? Sure. And I'd love to answer that because I think it goes to a broader point about carefully scrutinizing this complaint and the allegations, and I'm going to stick to what is in the record. I'm not going to talk about mining in general, but their accusation is that this statement is misleading and not forwarding. Fire Creek's, quote, current reserves and resources provide mining inventory out to 2023. They say that that's false because the life of mine only had three years left, not five. But they allege at JA 958, paragraph 131 of their complaint, life of mine means reserves only. But in fact, life of mine, I'm sorry, it actually encompasses reserves and resources. Not life of mine, but that statement. Right. I understand there's a mismatch between the statement they point to for why it's false, and I'm actually asking, and it might require you to educate me more broadly, what are resources and how are they used? So resources, and this is at JA 850, so it is in the documents, and this is actually in a Heckler financial statement, so, you know, it's submitted to regulators. Quote, resources have a great amount of uncertainty as to their existence and great uncertainty as to their economic and legal feasibility. And it actually says in that same page, resource does not equate to reserve. It's a broader definition. So when the challenge statement is current reserves and resources provide mining inventory after 2023, that's a very different thing than saying life of mine has three years, because life of mine is only reserves according to their own allegations. Right. Reserves is, and I just want to make sure I understand, reserves means this is what we can say with some degree of confidence we have in the ground that it's economic to harvest, and then resources are the potential that's a lot iffier as to whether or not it's economic to harvest, but we think it's there. It's a broader conception.  And why I say that, I want to pull this back and talk about how this is an example of, I think, particularly in the plaintiff's reply, misstating or restating their own allegations. So we made that argument in our response brief about how this is not a false or misleading statement, because it's talking about reserves and resources, and their own allegation is that life of mine only encompasses reserves. What did they say in their reply? At page 8 and page 6, footnote 5, they say, they kind of sneak it in there, life of mine is comprised of resources and reserves. So they're trying to sort of backfill that, but that contradicts their own allegation at paragraph 131, where they say life of mine only encompasses reserves. And the paragraph they cite in their reply, paragraph 13b7, does not support this new statement where they say life of mine is comprised of resources and reserves. And I think that's a very important point, because I think it illustrates, number one, you have to look carefully at what they are alleging and who knew it. Judge Robinson, you're exactly right. In the very first statement about the $162,000, there's no allegation that Baker knew any of that. We are at the pleading stage in this case. And what is pled, even with respect to the very first statements that come on the announcement of the acquisition after due diligence has happened? We are told by, apparently by, we have to take this as true, by someone who was doing the due diligence on the seller's side, that I told various things to the chief, one is the chief of, like, mining operations, and one is the chief of something else that's directly relevant to operating the mines. These are the people who are doing the due diligence investigation on the HECLA side. And there are some very disturbing things that are said about what is really going on at the mines, according to those confidential informants. And you're telling us that it is not plausible that the chief executive officer of HECLA was informed of what the people who are responsible for doing due diligence and therefore for advising the ultimate decision maker on, is this an acquisition we want to make? It is implausible that he was told. There is no plausible allegation that the CEO knew what his own people in charge of due diligence had learned in the course of preparing to make this acquisition. Because at the pleading stage, when they've had no access to talk to any of the top executives or to depose anyone, at the pleading stage, they have to allege specifically that those people that they haven't been able to talk to told Baker. Your Honor, under the PSLRA and its heightened pleading requirement, I think that is the case. So the only way you can possibly get through this, this maze for the plaintiffs, in a situation where there are multiple executives who say multiple things in each other's presence to the public, is that we have to scrutinize what did Hall know at this moment as opposed to what Bradford knew, as opposed to what Baker knew, rather than what it is, it seems to me, eminently plausible to believe, that all of this information, the whole point of doing the due diligence, is to have that information filter up. Your Honor, just a couple of responses. Number one, I do think that under the PSLRA, you have to particularly allege that the speaker knew of the falsity. And I want to say this also because it addresses the cautionary language aspect that my friend was talking about. If made by a natural person, was made with actual knowledge by that person, that the statement was false or misleading. But that doesn't mean that you can't have allegations from which you can plausibly infer that that person had knowledge. I mean, you don't think the PSLRA prohibits allegations through plausible inferences, as to see enter? Well, I think that you have to particularly allege, I mean, that's under 9b, that's under the PSLRA, and you have to particularly allege the who, what, when, where, etc. And particularly when we're talking about science here, I mean, I haven't even talked about sort of the big scheme that they allege that was going on here, that I think is another reason why the district court sort of summarily rejected it. It was this idea that the HECLA executives made this acquisition for $462 million so that they could increase the credit rating in order to refinance in or after May 2019. And that's the only thing they really added as to sort of the motive and the fraud, because that's the one thing that the district court said that doesn't make any sense. So they added, we're going to refinance in or after May 2019. But then May 2019 rolls around, and they didn't refinance, and instead they disclosed the purportedly true statements at that point. It's not a plausible inference, and it's certainly not cogent, and it's certainly not as compelling as any competing inference. Can I go back to sort of micro again for a second? There's some statements, and in particular, I guess, Statement 2 involving the grades, the extraordinary grades. And I understand your position that grade is a term of art, and that, in fact, there's no plausible allegation that it wasn't extraordinary grades. I understood how that's defined. One of the things I'm struggling with is whether that is the kind of true statement that is misleading by omission in the sense that the reason an investor would care about the grade is they would care about what that says about how much you're likely to get out of the ground for unit cost. And if it's high grade, but I guess refractory is the term that they use, to say the good part without the bad part is misleading. Tell me why that's wrong. Sure, Your Honor. I think that because according to the documents in this very case, the record in this case, and Plaintiff's own allegations, it was known that just saying high grade or extraordinary grade didn't necessarily mean not refractory. Plaintiffs themselves acknowledge in their second amended complaint at paragraph 11, that's JA 909, in their motion to dismiss opposition below at 4, and in their opening brief at 7, they say refractory or maybe high grade. Right. But in JA 194, you've got this chart, right? And it says high grade gold translates to low cash costs and strong cash flow. It seems to be. Because otherwise, who cares whether it's high grade, right? Why would you advertise that aspect of the gold unless it said something positive about the implications for the investor? And so you're specifically linking the grade to the cost when there's this other factor that is exactly the opposite in terms of the impact on costs that you're not disclosing. I'm struggling with this. Sure. Well, I think to go to that slide on 194, I mean, that slide specifically provides the definition of grade right there. It's gold equivalent ounces per ton of ore. And it's true. I mean, grade is a component of cash flow, income, profitability, but it's not the only one. And I think that that's what plaintiffs' allegations are resting on is that, oh, when they said high grade, they meant it absolutely had to be not refractory because that's what makes the statement false. Well, if you had high grade gold, let's just assume it's literally locked in the ground and you can't harvest it, but it's there and you know it's high grade. And I realize that's not the case here, but wouldn't that be pretty misleading to say we've just bought a mine full of high grade gold and high grade means low costs, et cetera? I mean, all those statements are literally true, but as an investor, it sends a completely misleading signal. Well, Your Honor, I think what I would respond to is in the context here, where I think what you're saying is that wouldn't a reasonable investor wonder if the gold in the ground was refractory or not? No, I'm not asking what they'd wonder. I'm asking what they would think you're communicating when you're describing the grade of the gold. I think it's a question, I think, of whether – yeah. Yeah, well, I think in this case – We're probably at a dead end on this one. But I think in this case, you don't have to wonder what the company was thinking because they provided the definition. They provided exactly what it means. So somebody, a reasonable investor, certainly someone maybe familiar with it or even not familiar with it, would look at that and say, okay, it doesn't mean the waterfront. It doesn't mean that this is absolutely going to result in a profitable mine. It doesn't even mean this is going to be the world's greatest mine ever. It does mean that they have a bar chart here, and it's providing the gold equivalent ounces per ton of ore, and it's saying that according to that metric, one of the mines lines up here, one of the mines lines up here. But of course with the problems that they had and the problems that they faced, I suppose you could say a reasonable investor would know that there were issues. The company threw – well, Mr. Hall, who is the chief financial officer, so you kind of think he might know what the cash flow situation is. The chief financial officer says in – I think this is December of 2018 – that there are no major capital expenditures that we can't fund out of the Nevada operations. So whatever they need to do to fix these problems with the refractory ore and the water in the mine is going to require some investment. And we're being told repeatedly through the fall of 2018 by various company statements, including this one by the chief financial officer, that the cash flow from the mine is going to cover it, don't worry. At a time when, Mr. Baker is telling us, we knew from the beginning that the cash flow was net negative, when it certainly is net negative at the time that that statement is made. So how can that be a true, non-misleading statement to say, don't worry, we've got this covered out of the cash flow that at the moment he says that does not exist. And this statement is coming from the chief financial officer of the company. Yes, we don't know that he knows what the cash flow is. Is that your argument? No, you're right. I think there are multiple reasons why that is not an actionable statement. Because, number one, I don't think it's false or misleading. The plaintiffs never argue this in their brief, so I think it's forfeited in the first place. But there's no facts alleged that Heckler didn't make that earlier 15 million capital expenditure or that they planned a future major capital expenditure. So I don't think that there's any falsity or misleading. Why would he be telling us about the major capital expenditures and saying we can fund those out of the cash flow if there's not some issue as to whether they're going to have to make major capital expenditures? I mean, I have to understand this. Looking at this as a theoretical investor in gold mines, which I'm smart enough not to be, how am I getting a true picture of what's going on in Nevada? Increasingly over time, whatever they believed, and I think your best point and the one that the district court battened on in the first place is this theory about raising capital doesn't make any sense to me. There's no reason why they would go buy a dog of a gold mine for a substantial amount of money if they knew it was a dog of a gold mine. So, okay, take out the statements that precede their acquisition. By the time you're going into they've been running this mine for a while and running into constant problems and being told all about those problems and they're still saying the same sunny stuff. Why am I not misled if I am, contrary to fact, a reasonable investor in a mining company? Well, number one, your honor, all throughout 2018, there has been disclosures of challenges and problems at these mines. Yes, and that's exactly why they're telling us don't worry about it because we've got that covered because there's still enough cash flow in the mines that whatever we need to do, we can pay for it. Well, I think you're also reading more into the statement than I think that they're even alleging. There's no major capital expenditures that we can't fund out of the Nevada operations. Now, there's major operations. A lot of that I don't think they're pleading with particularity. They can't fund anything out of the operations because the operations are losing money. Well, the other thing I would say to this, which I haven't said, is that everything we've been talking about in our colloquy is about the future. It's about the future. It's about what they plan to do, what they are capable of doing. That's all forward looking. And where is the caution about maybe it's really not true that we can fund all of this? Well, your honor, and I'm glad you asked that question because this goes to another point I want to make sure I make, which is that we've never said that there's cautionary language about it. This falls under the other prong of the PSLRA's safe harbor, which is that if there's no actual knowledge by the natural person who made the statement, that it falls under the safe harbor. And they say in their reply brief. Well, if there's no scienter, it doesn't need the safe harbor. It doesn't get there. Well, I agree there's no scienter at all. And I think that that's the most straightforward way to dispose of this case, and I'm happy to keep talking about that. But on this, if we're going to get into the misstatements, and we want to talk about forward-looking statements that were covered by the safe harbor, one of the other ways that you can do that besides cautionary language is if the plaintiff fails to prove with pleading that the forward-looking statement, if made by a natural person, was made with actual knowledge by that person, that the statement was false or misleading. And they never plead that with respect to this statement. And we point that out, and the only response they have in their reply is at page 13, footnote 12, where they say, aha, we don't even claim the safe harbor replies because we don't identify meaningful cautionary language. We don't have to. There's another prong of this, and that's what we argued in our response brief, and they don't have an answer to that in their reply. And I think it's telling, and I think it's indicative that you have to scrutinize the allegations very carefully. And the last thing I want to say before I sit down, if there's no other questions, my friend referred to, and I think you were saying, what if we have to go through this statement by statement? And he said, well, look at our table in the end. I would ask that if you do look at that table, look at it very carefully, because I think there are restatements of their allegations. I think there's generalities in there. I'd like to use just one example before I sit down, and that goes back to the 162,000 statements. One of them is the life of mines, but you and I have already discussed that, Judge Robinson. But the 162,000. The table says, and they say in their reply brief, this is false because, quote, production had already precipitously declined and would drop to the mid-80,000 ounces range in 2018. And they cite complaint paragraph 13.8 for that. The phrase production had already precipitously declined is not found in their allegations. It's not found in their complaint, and it's important because that is the hook they're using to try to claim that when that statement was made, it had to be false. When that 162,000, because it had already declined. But that's not what they allege. What they allege is that it would drop to mid-80,000s in 2018. And as I've tried to say here, I think that's indicative of why it's a forward-looking statement. They say over and over in their complaint that gold production would drop. Defendant Baker's representation that defendants would get over 160,000 ounces was materially false. That's at JA 946. So they are phrasing that in terms of projections, in terms of the future. That makes it a forward-looking statement. And the fact that they're going back to this restatement of their own allegation in the table and in the reply brief, I think, underscores that it is forward-looking. And I think you do need to scrutinize that table and their allegations very carefully. Thank you, counsel. Thank you. We'll hear rebuttal. First of all, on the point of extraordinary grades, the statement made by Mr. Baker in February, and, again, the statement number four in July 23, 2018, says HECLA now has three high-grade mines. So they don't even stay consistently with the distinction between high-grade ore and whether it's refractory or not. High-grade mines is not a term of art. High-grade mines means simply that these are highly productive mines. So they have abandoned that distinction in their own public statements. But if you're not using high-grade there as a term of art, doesn't that sound a lot like puffery? No. High-grade is just a question of are they productive or not. That's not puffery. That's a statement about how they are performing at the time. Puffery is we think the future is rosy, and they're allowed to say the future is rosy. To be in business means you have to assume a rosy future. That's why that doctrine exists. Mr. Hicks twice or three times used the term the reasonable investor, and I fully agree that this is the standard from Omnicare and the standard that should be applied. So the question is what does it mean to be a reasonable investor under these circumstances? That's ultimately the question in securities fraud cases. And the reasonable investor in a thickly traded stock on the New York Stock Exchange is one that responds to the information available to the market from these statements. So what was the market saying these statements meant? In our complaint, unaddressed by Mr. Hicks, unaddressed by the district court, are the allegations about what the market was saying at the conclusion of this. And so at JA973, we have J.P. Morgan saying you've been giving us exploration success. I'm a bit confused here. I don't understand. You have Cantor Fitzgerald saying stopping this mining is a desperate move. You have Moody's saying this is unexpected. These are unexpected operating issues. The claim here, the defense here, is that they were so clear in their forward-looking statements and cautionary language that it was obvious to everyone that there was trouble here, except to the very analysts who were the market makers in this particular domain. And this is unaddressed below. So if we are going to say this is sufficient to be cautionary, the market did not treat it as such. And then on the question of the statutory interpretation, the safe harbor provision has two parts. A is a forward-looking statement and tells us what it is. And B says the plaintiff fails to prove forward-looking statement if not made by an actual person. And that's the part that Mr. Hicks quoted, and that's absolutely right. But the A part is what defines a forward-looking statement, and that has two parts to it. And the A part says that it must be identified and accompanied by meaningful cautionary statements. We think none of these statements is identified by a meaningful cautionary statement that pertains to what the statement actually is. And so when they say these are high-grade mines, there is no cautionary statement attached to that that has any qualification about this being a high-grade mine. Therefore, we satisfy the — they don't satisfy the A part of this. It's not a cautionary statement. This Court in Slater, Judge Katzman, writes of the cautionary — of the cautionary — I'm sorry, the forward-looking statement provision as effectively an affirmative defense. It is a — and he says the burden is upon the party invoking the statutory safe harbor to prove it. And so our submission is that they can't rely on any of the protections of the safe harbor because they haven't met the threshold of A. And the threshold of A says you've got to identify it, you've got to say why, and then you have to say why it should be cautionary going forward. On the question of these are projections, of course they're projections, but you project based on what they're doing. I'm going to go out on a limb and say Aaron Judge is having a great season for the New York Yankees. The season's not over. How could I say such an irresponsible thing? Yes, it is a future projection, but it's a future projection based upon current facts of how he's hitting. This is the same thing here. When I say I'm going to hit 162,000 ounces this year, yes, of course, the year is not finished, but it doesn't mean that I could say I'm going to hit 10 million this year. It has to be based upon the internal facts that are known. That's what the market responds to, and I think the best evidence that we put forward that the market didn't know is the market makers themselves saying at the end of the period when they shut down the Nevada mines, this is a complete shock to us. If this is a complete shock to them, we are led to believe that we have not sufficiently alleged that it was also a shock to the normal investing public, like the main plaintiffs in this case or the class that they hope to represent. So we think that on the Sienta issue, we're not there yet because we don't know what statements are at issue because the district court said we don't have to look at any of these statements. They're all either forward-looking or puffery. If you reverse on that, I think then there should be argument below on what the actual Sienta requirement should be for the statements that are sufficient to survive a motion to dismiss. So when you were before the district court on the motion to dismiss, nobody argued about Sienta? Your Honor, we have never had an argument. We filed the first amended complaint. We waited over three years for an order dismissing us. We filed the second amended complaint. We waited over a year and a half. This is the first time we have argued this in a court. The district court, for whatever reason, had absolutely no interest in this case. I don't know why. I was not there. But nobody has argued anything, ever. Well, nobody's argued orally, right? That is correct. That is correct. But as this argument shows, this is a detailed issue. There's a lot of stuff going on in the complaint. There's a lot of allegations. There are confidential informants who were there telling the people at the time. You would think a court would want oral argument to help them walk through this record. It might, although after having a very effective oral argument from both sides today, it seems to me what I'm going to do is go back once again, as I did earlier, through the briefing and try to match up all of these statements, which is something that really doesn't work that well in oral arguments. Why ask you to give me your two best shots? Because there's no way that you could go through all eight of the statements in that level of detail. And Mr. Hicks did pretty much the same thing. And it's quite reasonable to focus on the things that are the most strongest for you, the most vulnerable for him. So it's not, you know, I don't think we can assume that the district judge had no interest in the case because the district judge thought the best way to address the party's arguments was to look in detail at what they had written and then respond with his own writing. And then we look at that writing and look at the underlying materials and try to figure out whether he got it right or wrong. But I have no interest in whether the district court had an oral argument or not. That's fair, Your Honor. All right. Thank you, Counsel. Thank you, Your Honor. We'll take the case under review.